UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PARTNER ASSESSMENT CORPORATION,

        Plaintiff,                                 Case No. 1:25-cv-12382

v.                                                  Honorable Thomas L. Ludington
                                                         United States District Judge

CLAUDIA ROSEN,

        Defendant.
_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S EX PARTE EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Partner Assessment Corporation seeks a preliminary injunction or, in the alternative, a temporary restraining order (TRO) to enjoin Defendant, Claudia Rosen, from employment with AEI consultants in violation of a noncompete agreement that she signed with Plaintiff. Because Plaintiff has shown a likelihood of success on the merits of two of its claims, the TRO will be granted.

I.

A.

Plaintiff Partner Assessment Corporation is a global, multidisciplinary consulting firm specializing in environmental and engineering services. ECF No. 9 at PageID.134. Among other things, Plaintiff's business offerings include building assessments, construction risk management, energy and sustainability consulting, and environmental health and safety. *Id.*

Plaintiff contends that the environmental and engineering consultancy industry is highly competitive, so it has heavily invested in building relationships with clients to maintain a competitive advantage in the marketplace. *Id.* In so doing, Plaintiff has maintained and developed trade secrets and other proprietary information, including the following:

> (A) the identities of Partner's business partners, referral sources, clients, and prospective clients; (B) the contacts at such business partners, referral sources, clients, and prospective clients who have authority to secure consulting services provided by Partner; (C) unique (i.e., client-specific and/or project-specific) scientific and business reports, proposals, plans, analyses, contracts, sub-agreements, invoices, and deliverables; (D) unique client profiles, including needs, requirements, preferences, businesses, habits, ongoing projects, and pricing agreements; and (E) financial and organizational information relating to the services offered and sold by Partner to its clients, including reports concerning financial data, performance, and profitability, business strategies, and growth strategies.

ECF No.9 at PageID.135. Because this proprietary information is valuable, Plaintiff requires employees as a condition of employment to sign nondisclosure and post-employment noncompete agreements. *Id.* at PageID.135–36. Further, Plaintiff limits access to trade secrets on a need-to-know basis. *Id.* at PageID.136.

**B.**

In 2016, Plaintiff extended a revised offer of employment to then-employee, Defendant Claudia Rosen. ECF No. 9 at PageID.136. Plaintiff conditioned Defendant's revised offer on her executing an agreement that included noncompete, confidentiality, and nonsolicitation provisions. ECF No. 9-3 at PageID.172–73. The noncompete provision provides the following language:

> Employee agrees that for a period of 12 months following termination of employment from the Company, Employee will not render to or for any Client any services of the type rendered by the Company or act as an employee, consultant, partner, or shareholder of any business that is engaged in the business of the same nature or competitive with that conducted by the Company on the date of termination of employment.

*Id.* at PageID.173. Additionally, the non-solicitation provision provided the following language:

> Employee agrees that Employee will not during employment or for a period of 12 months after the termination of the Employee's employment with the Company for any reason, without the prior written consent of the Company, whether directly or indirectly, (a) disrupt, damage, impair or interfere with the business of the Company by soliciting or interfering with any employee, consultant, officer or director of the Company or any of its subsidiaries for employment, consulting or other services elsewhere or (b) disrupt, damage, impair or interfere with the business of the

> Company by soliciting or interfering with any Clients or actively solicit, divert or take away any of the Company's Clients using Confidential Information.

*Id.* Finally, the confidentiality provision provided the following language:

> The Employee shall hold in confidence for the benefit of the Company all secret or confidential information, knowledge or data, Client information, supplier information, cost and pricing information, marketing and sales techniques, strategies and programs, research and development, unannounced product specifications and prototypes, computer programs and software and financial information relating to the Company or any of its affiliated companies and their respective businesses that the Employee obtains during the Employee's employment by the Company or any of its affiliated companies and that is not public knowledge.

*Id.* at PageID.172. Defendant executed the agreement on May 4, 2016. ECF No. 9 at PageID.136.

After that, Defendant received multiple promotions. To that end, in July 2021, Defendant was promoted to Principal and Technical Director. *Id.* Through this role, Defendant became a shareholder of Plaintiff, giving her greater access to Plaintiff's trade secrets and other confidential and proprietary information. *Id.* at PageID.137. And in July of 2023, Defendant was again promoted, this time to Principal and National Managing Director, making her the "APEX" leader of Plaintiff's Environmental Solutions Practice group. *Id.* Defendant's new role was client-facing—that is, Defendant communicated, consulted, and worked directly with Plaintiff's business partners, referral sources, and clients. *Id.* Sometimes, Defendant served as the primary or only point of contact for many of Plaintiff's clients. *Id.* Because of Defendant's senior position in management, she gained access to far more confidential and proprietary information, including information in Plaintiff's Client Relationship Management System. *Id.* at PageID.139. This system included proprietary and confidential information regarding almost every aspect of Plaintiff's ongoing and prospective projects, including client information about profit margins, contact information, and budgets. *Id.* But for signing the non-compete agreement, Defendant would not have had access to this system or information. *Id.*

**C.**

On June 30, 2025, Defendant provided a verbal notice of her resignation to her supervisor. *Id* at PageID.149. In response, at some point, Plaintiff sought an independent forensic analysis of Defendant's company-issued computer. *Id*. This analysis revealed that on March 14, 2025, before Defendant resigned from Plaintiff, she accepted an offer of employment from AEI consultants—Plaintiff's competitor. *Id.*

Between July 7 and July 11, 2025, Defendant allegedly used her computer to access, copy, and retain sensitive and confidential information, and continued to access these materials after her employment ended. *Id.* According to Plaintiff, Defendant retained access to these documents through a Dropbox account where she uploaded upwards of 5,000 sensitive and proprietary files in four separate sub-folders. *Id.* at PageID.141–42. One folder entitled "Documents" allegedly included 4,857 files relating to client proposals, marketing documents, project and costing documentation, and business plans. *Id.* at PageID.142. Another subfolder entitled "Proposal Resources" allegedly contained over 600 files relating to Plaintiff's strategic pricing information and formulas and proposal costing templates. *Id.* A "Docs" subfolder allegedly contained highly sensitive documents, some of which were so sensitive that they were password-protected. *Id.* Defendant allegedly had no legitimate need to access these files after her resignation. *Id.* at PageID.143.

Plaintiff also alleges that Defendant used her company-issued computer in December of 2024 to create a "business plan" for another competitor that Defendant ultimately never joined. *Id.* In that document, Defendant allegedly referred to her intention or plan regarding taking staff and project work to the competitor. *Id.* And on July 10, 2025, Defendant allegedly created a document titled "Clients to call.dox," listing eight of Plaintiff's clients. *Id.* The next day, Defendant allegedly

accessed an email from AEI titled "FW: New Hire Announcement - Suzi Rosen, Site Mitigation" in her personal Gmail. *Id.* Afterward, Defendant allegedly accessed a series of Plaintiff's high-level management and financial reports and took screenshots of these reports — saving them to Dropbox. *Id.* at PageID.144.

Plaintiff asserts that Defendant has continued to access the Dropbox folders she created, although to an unknown extent. *Id.* But Plaintiff states that Defendant accessed her Dropbox at least once on July 14, 2025, three days after her last day working for Plaintiff. *Id.*

AEI has since formally announced that Defendant joined its ranks. *Id.* at PageID.145. Defendant's role at AEI is in the same capacity as it was with Plaintiff. *Id.* And Plaintiff alleges that at least one critical referral source has already indicated that it is considering "following" Defendant to her new company and terminating its relationship with Plaintiff. *Id.*

**D.**

On August 1, 2025, Plaintiff sued Defendant, alleging that Defendant breached their noncompete agreement and violated both the Federal Defend Trade Secrets Act and the Michigan Uniform Trade Secrets Act. ECF No. 1. On August 11, 2025, Plaintiff moved for an ex parte preliminary injunction, or a temporary restraining order (TRO) that enjoins Defendant from working for AEI Consulting. ECF. No. 5. This Court rejected that motion on procedural grounds for inadequate notice. ECF No. 7. On August 14, 2025, Plaintiff renewed its motion for an ex parte preliminary injunction or TRO and provided different notice to Defendant via FedEx and hand deliveries. ECF. No. 9.

**II.**

A Court may issue a temporary restraining order without notice to the adverse party only if the movant sets forth "specific facts in an affidavit or a verified complaint clearly show[ing] that

immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and if "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).

If the movant clears those procedural hurdles, then courts move to the merits. In determining whether to grant a TRO, a court must weigh four factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief, (3) whether granting the preliminary injunctive relief would cause substantial harm to others, and (4) whether the public interest would be served by granting the preliminary injunctive relief." *A & W X-Press, Inc. v. FCA US*, LLC, No. 21-1805, 2022 WL 2759872, at *3 (6th Cir. July 14, 2022); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). The TRO standard is "logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

**III.**

As explained below, Plaintiff has shown that it is entitled to a TRO for its claims under the Defend Trade Secrets Act (DTSA) and Michigan Uniform Trade Secrets Act (MUTSA). But Plaintiff is not entitled to a TRO under its breach of contract claim because the non-compete agreement is likely overbroad as written.

**A.**

Start with Plaintiff's breach of contract claim. Under Michigan law, the elements of a breach of contract claim are "(1) that there was a contract, (2) that the other party breached the contract, (3) that the party asserting breach of contract suffered damages as a result of the breach."

*AFT Michigan v. Michigan*, 846 N.W.2d 583, 590 (Mich. 2014) (citation omitted). As a threshold matter, however, this Court must determine if the Plaintiff's noncompete contract is enforceable. *See Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 880 (E.D. Mich. 2016) (citation omitted) ("Specific to Plaintiff's allegation that Defendant breached the Agreements, Plaintiff needs to establish a strong likelihood that the parties had a valid contract."). Here, Plaintiff's noncompete is unenforceable because it is overbroad.

Michigan law provides that a noncompete agreement is enforceable when it satisfies two conditions: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking enforcement. *Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 950 (E.D. Mich. 2008). When filtered through these requirements, Plaintiff's noncompete, as written, lacks enforceability.

True, Plaintiff's covenants run for a reasonable duration. Indeed, Michigan courts have consistently held that noncompete agreements with one-year durations are reasonable and enforceable. *See Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 657 (E.D. Mich. 2007) (holding that Plaintiff's one-year non-compete was a valid duration); *see also Delphi Auto. PLC*, 167 F. Supp. 3d at 880. And both Plaintiff's noncompete and nonsolicitation clauses run for twelve months. Thus, both covenants are durationally reasonable.

Still, Plaintiff's covenants are not geographically reasonable. "Geographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is reasonably necessary to protect the employer's legitimate business interests." *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (citation omitted). Here, the language of both the noncompete and nonsolicitation clauses features no geographic limitation. ECF No. 9-3 at PageID.173 ("Employee will not render to or for any Client any services of the

type rendered by the Company or act as an employee, consultant, partner or shareholder of any business that is engaged in the same business…conducted by the Company") ("Employee will not during employment or for a period of 12 months after the termination of the Employee's employment with the Company… disrupt, damage, impair or interfere with the business of the Company by soliciting or interfering with any Clients or actively solicit, divert or take away any of the Company's Clients using Confidential Information"). "Such an agreement can be reasonable if the employer actually has legitimate business interests throughout the world." *Superior Consulting Co.*, 851 F. Supp. at 847. Plaintiff is an international company that competes and serves clients around the globe and throughout the United States. ECF No. 9 at PageID.147–48. Its website indicates that they operate in over forty-nine cities and twenty states in addition to Washington D.C. PARTNERESI, *Global Reach, Local Expertise* (last accessed Aug. 15, 2025) [https://perma.cc/9A5F-S8FA]. Plaintiff's website also indicates that it operates in eight countries across the globe. *Id.* So, to be sure, Plaintiff has shown that it is an international company.

But that showing is not enough. Even if a company is international, a noncompete may be overbroad as applied to a particular employee. *Whirlpool Corp. v. Burns*, 457 F. Supp. 2d 806, 813 (W.D. Mich. 2006) (finding a global non-compete overbroad because it prevented the defendant from selling appliances anywhere in the world, even if such sales did not involve any of the same customers he served during his tenure working for the plaintiff); *see also Mapal, Inc. v. Atarsia*, 147 F. Supp. 3d 670, 678 (E.D. Mich. 2015) (holding a non-compete geographically overbroad because it prevented the defendant from working anywhere in the world when the defendant had only worked for the plaintiff in North America). Plaintiff has not provided any information to indicate that Defendant engaged in international business. Plaintiff stated the opposite when describing Defendant's role as national Managing Director: "*[t]hroughout the United States*,

[Defendant] was responsible for working with members of every major department at [Plaintiff] to deliver high-quality multidisciplinary services to clients." ECF No. 9 at PageID.137 (emphasis added). Plaintiff also states that it provided a plethora of opportunities for Defendant to meet and develop relationships with clients; however, those opportunities all appear to have been within the United States. *Id.* at PageID.138. So the noncompete agreement is geographically overbroad.

Lastly, the covenants are overbroad as to the line of business they prohibit. "A limitation on working in any capacity for a competitor of a former employer is too broad to be enforceable." *Superior Consulting Co.*, 851 F. Supp. at 847. And courts are skeptical of noncompete agreements if their scope is so broad as to limit a person from working in any capacity in an industry. *See Gateway 2000, Inc. v. Kelley*, 9 F. Supp. 2d 790, 797 (E.D. Mich. 1998) (a noncompete that "limited [the employee] from working as an 'individual, partner, shareholder, director, officer, principal, agent, consultant, [or] employee' for any company directly or indirectly competitive with Gateway in any state or country where Gateway sells its product" was unenforceable because it had "the practical effect of preventing [the employee] from working in any capacity for any computer-related company anywhere in the world."). Plaintiff contends that the noncompete agreement only prohibits Defendant from working for a direct competitor. ECF No. 9 at PageID.147. Yet the plain language of Plaintiff's noncompete would apply to all employers, whether direct or indirect competitors, who engage in similar business as Plaintiff's. ECF. No. 9-3 at PageID.173 ("Employee will not render to any Client any services of the type rendered by the company or act as an employee, consultant, partner, or shareholder of any business *that is engaged in the business of the same nature or competitive with that conducted by the Company*") (emphasis added). This language would prevent Defendant from working in any capacity with any employer

engaged in the same business as Plaintiff. Thus, the language of Plaintiff's noncompete agreement concerning the scope of prohibited business is overbroad.[1]

### B.

Plaintiff has demonstrated a likelihood of success on the merits for both its MUTSA and DTSA claims. "Where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 505 (E.D. Va. 2021) (citing *W. Indus.-N., LLP v. Lessard*, No. 1:12CV177 JCC/TRJ, 2012 WL 859459, at *5 (E.D. Va. Mar. 13, 2012)). Thus, Plaintiff is entitled to a TRO.

Up front, courts have stated that the elements of misappropriation under federal law are substantially similar to the elements of misappropriation under Michigan state law. *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020). Accordingly, the analysis will be directed to the merits of Plaintiff's MUTSA and DTSA claims together.

### 1.

Under both laws, the first element the plaintiff must establish "is that the information at issue actually constitutes a 'trade secret.'" *Mike's Train House, Inc. v. Lionel*, L.L.C., 472 F.3d 398, 410–11 (6th Cir. 2006) (citing *Stromback v. New Line Cinema*, 384 F.3d 283, 302 (6th Cir. 2004)). "MUTSA defines 'trade secret' as information that (1) '[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use,' and (2) '[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *FCA US*

---

[1] Under MICH. COMP. LAWS § 445.774(a)(1), courts may limit a noncompete agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited. At this juncture, however, this Court declines to do so without further briefing from the parties pertaining to the facts of Defendant's employment.

*LLC v. Bullock*, 446 F. Supp. 3d 201, 212 (E.D. Mich. 2020) (citing Mich. Comp. Laws § 445.1902(d)). "Of critical importance . . . to be worthy of trade secret status, the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors." *Dice Corp. v. Bold Tech*., 556 F. App'x 378, 385 (6th Cir. 2014) (quoting *Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l., Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008)). A trade secret must be identified "'clearly, unambiguously, and with specificity.'" *Utilase, Inc. v. Williamson*, 188 F.3d 510 (Table) (6th Cir. 1999) (quoting *Shatterproof Glass Corp. v. Guardian, Glass Co.*, 322 F. Supp. 854, 867 (E.D. Mich. 1970)). "The identification of alleged trade secrets is important because 'the general knowledge of an employee does not constitute a trade secret.'" *Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1125 (E.D. Mich. 2019) (citing *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp.*, No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. May 24, 2012)

The information Plaintiff claims Defendant misappropriated is trade secrets. Plaintiff contends that Defendant misappropriated information relating to Plaintiff's business partners, referral sources, clients, and prospective clients, financial and organizational information relating to its services, Plaintiff's financial reports and profitability, and future business and growth strategies. ECF No. 9 at PageID.151. All of this information constitutes trade secrets. *See RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020) (concluding that a District Court did not err in finding that information related to "strategic future planning", "business development strategy", "regional pricing strategy", and "margins" constituted trade secrets); *see also Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1126 (E.D. Mich. 2019) (holding that a spreadsheet containing detailed analysis of all the plaintiff's customers throughout the U.S. including their identity, pricing, revenue, and origin, another spreadsheet that contained "top

customers and top sales representatives in the market, with revenue and gross margin trends on a monthly basis", and an email that contained highly sensitive financial data were all trade secrets).

Plaintiff derives independent economic value from its trade secrets because their competitors do not have access to them. Courts have routinely held that companies gain independent economic value from their trade secrets because their competitors do not have access to them. *See, e.g.*, *Radiant Glob. Logistics, Inc.*, 368 F. Supp. 3d at 1126 (holding that the plaintiff's trade secrets "derive independent economic value from not being generally known or discoverable through proper means to others"); *RGIS, LLC*, 817 F. App'x at 162 (citing *RGIS, LLC v. Gerdes*, No. 19-11866, 2019 WL 3958392, at *7 (E.D. Mich. Aug. 21, 2019)) (upholding an injunction where use of the plaintiff's confidential business information would have harmed its "ability to compete with its competitors"). Plaintiff has cultivated goodwill and relationships with its clients. ECF. No. 9 at PageID.134. Plaintiff has gathered information relating to major business partners, referral sources, both potential and current clients, including contact information, the status of ongoing projects and contracts, pricing information, etc. *Id.* at PageID.139. Plaintiff argues that this information could be used to poach potential clients from them or tailor the competitor's services and proposals to exploit Plaintiff's weaknesses. *Id.* at PageID.152. Therefore, Plaintiff derives independent economic value from its trade secrets because their competitors do not have access to this sensitive information.

Next, Plaintiff has taken reasonable measures to keep its trade matters a secret. "'Sufficient measures' under MUTSA have been found in 'either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer

to insure that only a limited number of authorized individuals have access to the information.'" *Radiant Glob. Logistics*, 368 F. Supp. 3d at 1128 (citing *Wysong Corp. v. M.I. Indus.*, 412 F.Supp.2d 612, 626 (E.D. Mich. 2005)). While Plaintiff's noncompete agreement is overbroad as written, *see infra* section III.A., Plaintiff still made attempts to protect its trade secrets through both the noncompete and confidentiality agreements. ECF. No. 9 at PageID.140. In fact, Defendant's employment with Plaintiff was predicated on her signing these noncompete and confidentiality agreements. *Id.* at PageID.136. Plaintiff also limits access to its trade secrets and other confidential and proprietary information on a need-to-know basis, which included Defendant due to her role in management. *Id.* Plaintiff even went so far as to password-protect certain highly sensitive documents that Defendant allegedly misappropriated. *Id.* at PageID.142. Thus, Plaintiff has taken more than adequate steps necessary to protect the secrecy of its trade matters.

Lastly, Plaintiff has satisfactorily identified its trade secrets, and they are not the type that would be the general knowledge of the Defendant. "[I]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain." *Mike's Train House*, 472 F.3d at 411 (quoting *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F.Supp.2d 1, 9 (D. D.C. 2004)) (alteration in original). Courts have also held that detailed customer reports and client lists are not the type of information that would be the general knowledge of an employee. *Radiant Glob. Logistics*, 368 F. Supp. 3d at 1127 (holding that emails containing detailed reports on the plaintiff's top 20 customers and an accumulated client contact list while working for the plaintiff were not information that would be general knowledge of an employee—thus, not protected as a trade secret). Further, in *Radiant Glob. Logistics*, the court held that the defendant, having been given access to the proprietary information through his position as manager of the plaintiff's company, did not have personal ownership over the

information. 368 F. Supp. 3d at 1127–28. Here, Defendant only gained access to Plaintiff's confidential information because of her position in senior management. ECF No. 9 at PageID.138 ("Because of her senior position and management and business development responsibilities, [Defendant] was provided access to trade secrets and other confidential and proprietary information across entire projects and engagements with a client or prospective client, not simply one aspect of any particular engagement"). Plaintiff also invested heavily in Defendant's ability to meet and develop relationships and goodwill with clients by sending her to meet clients in person at conferences, trade group meetings, and other events. *Id.* Thus, any proprietary information that Defendant gained in her experience working for Plaintiff was due to her position in senior management at Plaintiff and not a byproduct of general knowledge by the Defendant.

**2.**

The second element under MUTSA is misappropriation. "Misappropriation" under MUTSA is defined as either:

> *(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.*
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>
>> (A) Used improper means to acquire knowledge of the trade secret.
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Prudential Def. Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 936 (E.D. Mich. 2020) (citing MICH. COMP. LAWS § 445.1902(b) (emphasis added)).

There is sufficient evidence that Defendant acquired Plaintiff's trade secrets by improper means. Courts have held that downloading confidential files and uploading them to a personal Google Drive to retain files after termination could constitute the acquisition of a trade secret by improper means. *Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 595 (E.D. Mich. 2023). Courts have also held that plaintiffs need not establish that defendants disclose or use the files they misappropriate because MUTSA only requires that a plaintiff show that the secret was disclosed or acquired. *See id.* Here, Defendant allegedly downloaded almost 5,000 files and uploaded them to a personal Dropbox folder just days before she left Plaintiff. ECF No. 9 at PageID.141–42. The information was highly confidential and secretive, including documents related to projects, costs, business plans, client proposals, project names, and contract values. *Id.* Defendant has allegedly accessed this information as late as three days post-termination from Plaintiff. *Id.* at PageID.144. Plaintiff has alleged that Defendant had no need to access this information after her termination. *Id.* at PageID.143. Thus, there is sufficient evidence that Defendant acquired Plaintiff's trade secrets by improper means, and Plaintiff is likely to succeed on the merits of both its MUTSA and DTSA claims.

### 3.

Plaintiff has successfully argued that it will suffer irreparable harm absent a granting of a TRO. A plaintiff's harm is not irreparable if it is fully compensable by money damages; however, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). One such instance is the loss of goodwill from existing and prospective clients. *Id.* at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."). In *Kelly Servs., Inc. v. Noretto*, the court concluded

that it was entirely unreasonable to expect the defendant to work for a direct competitor in a position like the one they held while working for the plaintiff and to forgo the intimate knowledge of the plaintiff's business operations. 495 F. Supp. 2d 645, 659 (E.D. Mich. 2007). The court concluded that, absent injunctive relief, the defendant's expansive knowledge of the plaintiff's business systems and operations would result in a loss of customer goodwill developed by the plaintiff. *Id.*

Similarly, Defendant has agreed to work for AEI, a competitor in the same industry as Plaintiff, in a position substantially similar to the one she held while working for Plaintiff. ECF No. 9, PageID.149. Further, Plaintiff contends that the environmental and engineering consulting industry is highly competitive, with all corporations vying for similar contracts and projects. *Id.* at PageID.134. Because of her position in senior management while working for Plaintiff, Defendant gained a considerable amount of confidential knowledge from Plaintiff about the industry and select clients. *Id.* at PageID.138. Like *Kelly Servs., Inc.*, Defendant cannot be expected to forgo her intimate knowledge of Plaintiff's operations, and any harm to Plaintiff will be indefinite and speculative in scope—thus, the damage is irreparable. 495 F. Supp. 2d at 659. As a result, Plaintiff has satisfied the second prong of the preliminary injunction analysis.

**4.**

There are no substantial harms to others or the general public. In the present case, there is no evidence that there will be harm to the general public. However, in considering this factor, courts may also consider harms that may be inflicted upon Defendant by the issuing of a TRO. *See Kelly Servs., Inc.*, 495 F. Supp. 2d at 660. The Court recognizes that if a TRO is granted, Defendant will not be able to continue in her current position at AEI for at least fourteen days. But Defendant's potential harm is mitigated. Again, in *Kelly Servs., Inc.*, the court held that the defendant's harm

was mitigated, in part, because he could seek employment in another industry. 495 F. Supp. 2d at 660. Second, the court held that the defendant's harms were mitigated because he voluntarily signed the terms of the agreement that prevented him from working for a competitor of the plaintiff. *Id.* Here too, Defendant can mitigate her harms by working outside the industry. Instead, Defendant has chosen to work for a direct competitor of Plaintiff. Second, Defendant voluntarily signed the confidentiality and noncompete agreements meant to prevent her from misappropriating Plaintiff's trade secrets to help competitors. ECF. No. 9 at PageID.140. In fact, it was a condition of her employment with Plaintiff that she sign these covenants. *Id.* Finally, a TRO only lasts for fourteen days with the possibility of extension "for a like period" after a finding of good cause. FED. R. CIV. P. 65(b)(2). At this juncture, there is no substantial harm to the Defendant that would justify a prohibition on granting a TRO.

**5.**

Issuing a temporary restraining order protects the public interest. "The public has an interest in enforcement of legislatively enacted laws." *Kelly Servs., Inc.*, 495 F. Supp. 2d at 661. "Such an interest surely extends to the enforcement of the Michigan Uniform Trade Secrets Act, an act that prevents disclosure of trade secrets and explicitly provides for injunctive relief in instances of actual or threatened misappropriation of trade secrets." *Id.* This Court would further the public interest by granting a TRO to prevent continued misappropriation of Plaintiff's trade secrets.

**IV.**

One final issue must be addressed. Civil Rule 65 of the federal rules of civil procedure contains one more procedural hurdle:

> *No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant*, in such sum as the court deems proper, for the payment of such costs and

damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

FED. R. CIV. P. 65(c) (emphasis added). Failure to consider the question of security has been considered an error by the Sixth Circuit. *Beukema's Petroleum Co. v. Admiral Petroleum Co.*, 613 F.2d 626, 629 (6th Cir. 1979). Here, Plaintiff has not provided this Court with security sufficient to cover damages that may be incurred by a wrongfully enjoined party. *Kelly Servs., Inc.*, 495 F. Supp. 2d at 661. So this Court will grant Plaintiff's motion for a TRO, but will also direct Plaintiff to address the security interest.

V.

Accordingly, it is **ORDERED** that Plaintiff's Motion for a Temporary Restraining Order, ECF No. 9, is **GRANTED.**

Further, it is **ORDERED** that Plaintiff is **DIRECTED** to provide a security interest necessary to satisfy FED. R. CIV. P. 65(c).

Last, it is **ORDERED** that counsel for both Plaintiffs and Defendants are **DIRECTED** to appear in-person for a status conference on **August 27, 2025, at 9:00AM, EST**.

**This is not a final order and does not close this case.**

Dated: August 20, 2025                     s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge